**In re John W. BYRD, Jr., Movant.**

**No. 01–3927.**

United States Court of Appeals, Sixth Circuit.

Filed: Sept. 11, 2001.

Refiled: Sept. 12, 2001.

Refiled: Sept. 14, 2001.

### ORDER

A member of the court has requested that the en banc court determine whether to vacate the stay of execution included in its September 10, 2001 decision on the movant's request for a determination that 28 U.S.C. § 2244(b) does not apply to him, and his request for a stay of execution while he pursues a second federal habeas petition.

The request for an en banc determination has been referred to all of the active judges of the court, less than a majority of whom have voted in favor of vacating the stay. A majority of the active judges have voted to extend the stay of execution until October 8, 2001; in addition, the clerk of the court is directed to file and submit to the court any petition offered by a party seeking en banc review of the decision of the panel.

**IT IS SO ORDERED.**

### AMENDED CONCURRENCE

NATHANIEL R. JONES, Circuit Judge, concurring with the order granting the stay of execution to October 8, 2001, in which COLE, Circuit Judge, joins.

With the United States Supreme Court's September 12th (6–3) denial of the State of Ohio's application to lift the stay of execution entered by a majority of the active judges of this court on September 11, and the dissatisfaction the non-prevailing judges have expressed with the procedures of this court in this matter, I feel compelled to write in support of the order of a majority of the en banc court extending the stay of execution. In so doing, it is necessary to refute the gross mischaracterization and factual misstatements contained in the dissents filed in this case.

On Tuesday September 11, a majority of the active judges did the following two things with respect to this case: (1) declined to lift an eight-day stay of execution set out in the Order drafted by Judge Suhrheinrich, and (2) decided to grant a stay of execution until October 8, 2001.

How this took place is very simple. The three-judge panel consisting of Judges Suhrheinrich, Batchelder, and myself, split, 2 to 1, over the issue of Byrd's entitlement to file a second petition and his request for stay of execution. On Saturday, September 8, I requested that Judge Suhrheinrich join in granting a thirty-day stay of execution. He tentatively agreed to do so. However, on September 10, during a panel conference call, he pro-

posed a stay of only eight days. Judge Batchelder objected in the strongest of terms and threatened to dissent. And she did dissent. I told Judge Suhrheinrich that I was withholding judgment until receipt of his Order. Upon reviewing the panel majority's twenty-five page Order and its injudicious language, I advised Judge Suhrheinrich, its author, orally and in writing, with a copy to Judge Batchelder, that in the interests of justice and fundamental fairness regarding this most final and irreversible of punishments, I was compelled to seek the longer stay.

I then spoke with Chief Judge Martin and a majority of the active judges. I expressed to each my views and urged them to consider my dissent to the panel majority's proposed order refusing realistic relief for the Petitioner, who faced death within thirty-six hours. Discussions between judges of this court are nothing new, especially in emergency situations such as the one involved here. Mr. Byrd was scheduled for execution at 10:00 a.m. September 12. Judge Suhrheinrich's proposed Order was received in chambers at 1:01 p.m. on the afternoon of September 10. However, before I had formalized a stay motion, on September 10, Judge Boggs, a non-panel member, interceded by filing an objection to the eight-day stay proposed by Judge Suhrheinrich and sought to have the en banc court vacate the stay. Judge Boggs also requested a polling of the active judges be taken by the Clerk of Courts regarding the stay.

The en banc court was thus activated by Judge Boggs's request. "Only Sixth Circuit judges in regular active service may cast votes on" an en banc poll. Sixth Circuit Internal Operating Procedure 35(a). In response to Judge Boggs's intervention seeking to vacate the eight-day stay, when polled, less than a majority of the en banc court favored his application.

Instead, in individual communication with the Chief Judge and/or the Clerk of Courts, a majority favored extending the stay to October 8, 2001; pursuant to a directive to the Clerk of Courts by the Chief Judge, an Order to this effect was filed on September 11. The exigencies of the circumstances required the prompt entry of the Order to preserve the status quo.

There was nothing secretive or mysterious about the procedure. Judge Suhrheinrich states in his dissent that "[T]here was no discussion as to the views and opinions of the minority of the Court members." These views were quite well-known by virtue of the panel Opinion and the filing of the objection. There seldom is a joint discussion when the polling occurs. It is not a collaborative process nor is a plenary session required. Judges are polled in a variety of ways for they are often in locations remote from the seat of the court. On numerous occasions this court, faced with urgent deadlines in death penalty and other cases, has needed to make contact by telephone and the other expeditious methods of communication in order to ascertain the will of individual judges.

Moreover, the significance of the fact that this process took place in the midst of the catastrophic events of September 11 should not be lost on my colleagues. On that day, the Chief Judge was away from his home chambers in Washington D.C., attending sessions of the Judicial Conference of the United States. Everything in our nation's Capital was disrupted that day, necessitating even an evacuation of the Judicial Conference. Notwithstanding the difficulties of the moment, the Chief Judge was able to use the means available to him to conduct the affairs of this court and did so appropriately.

An action is taken in the name of the en banc court when a majority of the judges

in "regular active service" votes a particular way on a particular issue. The method of ascertaining views is not prescribed. When a majority of the active judges registered their preference—by whatever means—the requirement was met. It should be noted that none of the en banc majority has questioned the procedures that led to the filing of the stay order.

At approximately the same time, the State of Ohio presented an application to United States Supreme Court Justice Stevens, as Circuit Justice, seeking to have the Supreme Court vacate the enlarged en banc stay. Upon referral to the entire Supreme Court, the application was denied, with three justices in dissent.

A majority of the active judges of this court felt that, in this emergency situation, a reasonable extension to October 8th was in order. Six justices of the United States Supreme Court voted not to disturb that decision. This court clearly acted appropriately in this matter, assertions to the contrary notwithstanding.

NATHANIEL R. JONES, Circuit Judge concurring in Order extending the Stay of Execution to October 8, 2001.

In light of Judge Boggs' amendment to his previous dissent, I must add two rebuttals to assertions it contains. First, its challenge on the basis of "It is simply a lie", the statement that "the exigencies of the circumstances required the prompt entry of the Order to preserve the status quo", ignores the fact that the attempt by Judge Suhrheinrich to grant a stay until September 18 had failed. Neither Judge Batchelder nor I concurred in that part of the Order. That meant that the execution date of September 12 remained in effect. I deemed that to be an "exigent circumstance."

The second rebuttal is note that the Clerk of Court was under a continuing directive from the Chief Judge to enter a stay Order he had previously prepared, at the appropriate time. The Clerk of Courts was fully cognizant of the Chief Judge's desires with respect to that Order. When the Chief Judge was advised that a majority of the active judges (confirmed by the Clerk) had expressed a desire to join in the thirty day stay the Chief Judge had previously directed be entered at the appropriate time, the Clerk was advised to enter the Stay Order as modified to reflect the support of the en banc majority. He was to do so "at the direction of the Chief Judge."

Finally, the concurrence's reference to the tragic events of September 11 and their disruptive effects on proceedings of the Judicial Conference in Washington and access to Judge Martin there, was meant only to note the obvious. He sought to perform his administrative and judicial duties on and after September 11, away from his Chambers, under the severe handicap created by that tragedy.

This case has stirred a disturbing degree of acrimony within the court which reflects the politicization of the issues by some public officials with motives open to serious question. It creates a climate that Judge Cranch warned about in one of the most eloquent dissents ever written nearly two hundred years ago:

> In times like these, when the public mind is agitated . . . . . it is the duty of a court to be peculiarly watchful lest the public feeling should reach the seat of justice, and thereby precedents be established which may become the ready tools of faction in times more disastrous. The worst of precedents may be established from the best of motives. We ought to be on our guard lest our zeal for public interest lead us to overstep the bounds of the law and the Constitution: for although we may bring one criminal to punishment, we may furnish

the means by which an hundred innocent persons may suffer.

> The Constitution was made for times of commotion. In the calm of peace and prosperity there is seldom great injustice. Dangerous precedents occur in dangerous times. It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude.

As this court proceeds to examine the issues presented by the parties to this dispute, my hope is that we pay heed to the wise advice of Judge Cranch to "calmly poise the scales of justice." We all should be prepared to live with the ultimate result.

BOGGS, Circuit Judge, dissenting from the refusal to vacate the panel's stay and dissenting from the order extending the stay.

The panel's order of September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, addresses Byrd's self-titled "Motion [to] Determine Whether 28 U.S.C. § 2244(b) of the AEDPA applies to His Case." However, procedurally Byrd's motion can only be one thing if it is to be properly before this court: an application pursuant to 28 U.S.C. § 2244(b)(3)(A), seeking permission of the court of appeals to file a second habeas petition. The panel dealt with Byrd's motion as such, *see id. at n. 1,* and rendered a decision on the merits, first holding that § 2244(b) does apply to Byrd and then denying his request to file a second habeas petition. An order such as this, denying permission to file a second habeas petition, is not reviewable en banc. *See In re King,* 190 F.3d 479, 480–81 (6th Cir.1999).

Alternatively, the panel may have found Byrd exempt from AEDPA. However, in that case, this court would have no jurisdiction over his petition, as a habeas petition must be filed first in district court. Had Byrd gone to district court, it is conceivable that action by the district court could be reviewed on appeal or en banc. However, our court cannot take jurisdiction over a non-AEDPA habeas petition in the first instance.

I can understand how a panel, faced with a last-minute motion, and out of an abundance of caution, could stay an execution while it is considering the motion. I can understand why a member of the panel, for tactical or other reasons, could request that the panel defer a ruling and issue a stay.

However, I cannot understand how a panel can render a decision on the merits, which affirmatively finds that the prisoner's claims have no merit, and then issue a stay to allow one member of the panel "additional time to consider the matter." We are not a "super-court" that supervises all executions in the states within our jurisdiction. Our jurisdiction is limited by Constitution and statute. The panel has determined all matters that come within that jurisdiction.

This court's power to issue a stay was therefore dubious at best (a fact that the panel apparently later recognized, since it removed all reference to the stay from its amended decision. *Compare* September 10, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, and Granting a Temporary Stay of Execution until September 18, 2001, *with* September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case). Then, however, the situation was exacerbated when the clerk of this court issued a much longer stay, apparently based on the word of one Article III judge that a majority of the active members of the court had approved it. This

act was taken in response to no apparent motion, it had no jurisdictional basis, and it was done *without providing any notice to some members of the court.*

What we hold, apparently, is that death-sentenced prisoners need not resort to creative legal tactics to come within this court's jurisdiction. So prisoners may file anything, regardless of statute or prior law, and the en banc court may stay their execution for any length of time it chooses. For example, they could file a hot dog menu, and the en banc court might use that as a legal basis to stay their execution.

The truth may be that for *this* prisoner, a majority of the active members of *this* court would grant a stay based on a hot dog menu. This, however, is not a correct statement of the law (nor is it of any sort of law at all).

Under these circumstances:
either the Supreme Court must reverse, at a minimum, the *extended* stay;
this court must adopt new court rules explicitly allowing this type of currently lawless action; or
we must recognize and confess that a majority of the court simply feels that it is not bound by law when it comes to some death-sentenced prisoners.

BOGGS, Circuit Judge, dissenting, in which SUHRHEINRICH and BATCHELDER, JJ., join. I add to my previous dissent, because any false impressions that a reader might take from other opinions on the public record should not stand uncorrected.

A voting ballot was issued to the nine active members of the court on Monday on my request to vacate the stay originally granted by the panel. That ballot said that votes could be cast at any time up until 2 P.M., Tuesday, September 11. At that point Byrd's execution was firmly stayed until September 18.

So far, so good, at least procedurally.

Monday night,[1] with the time for voting not having run, with only one formal vote (no) having been received in the Clerk's office (and 2 additional no notes and 3 yes votes still to be received Tuesday morning), the Clerk was informed verbally, by an Article III Judge, purporting to speak for the Chief Judge, that he should enter an order *immediately* the next morning, without any prior notice to the rest of the court, that would:

1) Deny the motion to vacate the stay, on which the time for voting had not expired, and on which no majority of negative votes had been received. [This was procedurally virtually criminal, as the only notice to the court indicated that each judge would have until 2 P.M. to vote (and, by practice, to change his or her vote, within the stated time) ];

2) Enter an order extending the stay for 30 days, based on an alleged agreement from unnamed judges to a proposition without stated procedural basis, which had never, before or after, been reduced to writing, nor had or have its supporters yet been identified nor reduced to writing, nor had the proposition or its support been made available to many (perhaps all) members of the court; and

---

1. I emphasize in the strongest terms that the issuance of the court's order had NOTHING to do with the tragic events of Tuesday morning. The order to file the opinion had been given Monday night. Whatever judges supported that order at that time could not have, in the words of Judge Jones, "felt, in this emergency situation, a reasonable extension to October 8th was in order." Nor could they have believed, in his words, that "Petitioner faced death within thirty-six hours" since a stay was in place for more than a week from that time.

3) Enter an order directing prospectively the filing and circulating of an as-yet unreceived document purporting to be an en banc petition, in a circumstance where it is extremely dubious that such a petition is permissible. In fact, unanimous direct precedent of this court *en banc,* (see *In re King,* 190 F.3d 479 (6th Cir.1999)· (en banc)), and statutory authority, are specific that the petition would be an impermissible attempt to obtain en banc consideration of a matter that is not within the jurisdiction of the en banc court.

Again, this order was to be entered on the word of an Article III judge, purporting to speak for the Chief Judge, with the support of unnamed judges, whose support has never yet been memorialized in writing, upon a proposition never put before the other members of the court or reduced to writing.

Members of the court may indeed act in an informal manner in recording their opinions upon stated matters, in situations of extreme time pressure. There was no such pressure, and there was no stated matter. It is simply a lie to say that "the exigencies of the circumstances required the prompt entry of the Order to preserve the status quo." The status quo was preserved until September 18. It is also inaccurate to infer from the words "[i]nstead . . . a majority favored extending the stay" that each of those majority members acted subsequent to the request for a vote on vacating the stay. I am reliably informed that one or more judges whose approval was represented for the longer stay gave such approval before there had been either any action by the panel or the request for a vote on vacating the stay.

Finally, my information is that the "Clerk of Courts" had received NO communication from individual active members of the court as to the longer stay. What "individual communication with the Chief Judge" may have occurred is a matter which the Chief Judge has yet to communicate to me, the court generally, or to the Clerk.

This type of secret undocumented decision-making by exclusive in-groups is the way decisions are made in totalitarian countries, not usually in the United States. It is necessary, though highly painful, for me to place on the public record the way in which this purported order was issued, and to dissent from that process, far beyond my dissent from the underlying and fundamental lack of legal support for the order.

BOGGS, Circuit Judge, dissenting from Order extending the Stay of Execution to October 8, 2001.

On the afternoon of Monday, September 10, this court issued an order containing the language "but the execution will be stayed until September 18, 2001, upon the request of a panel member . . . ." Late that day, I made a request for an en banc vote, and a voting ballot was sent out by the Clerk that evening asking for votes to "determine whether to vacate the 8–day stay of execution entered in this case." It would, of course, have been absurd for such a ballot to be sent out if no stay were in effect.

A candid reader may compare the above undisputed facts with the statements in the addenda to Judge Jones's concurrence, which he filed on September 19.

The addenda also contains the statement "that a majority of the active judges (confirmed by the Clerk) had expressed a desire to join in the thirty day stay . . . ." No information has come to my attention to suggest that the Clerk so confirmed the position of a majority of the active judges.

SUHRHEINRICH, Circuit Judge, dissenting from the refusal to vacate the panel's stay and dissenting from the order extending the stay.

I write in dissent of the so-called en banc court's decision to grant a thirty-day stay of execution. I do not quarrel that any federal judge could grant a stay. *See* 28 U.S.C. § 2251. My problem is with the "procedure" used in this case.

A thirty-day stay was granted without anyone from the Court asking me, a member of the panel, for my opinion, let alone my vote. This vote was not an en banc procedure but was done in secrecy by some of the active members of the Court. The vote was taken orally by telephone and not by written response to a petition as is the custom of this Court. There was no motion or formal request for me to reply to. If any of the Judges voting had bothered to read my opinion, they would know that there is a serious question as to whether this decision can even be reviewed by an en banc court. They also would know that Byrd's attorneys had this affidavit since *1989*. Byrd was under an order by this Court in 1994 to raise and divulge any claim he might have. After oral argument and before the decision was made on the first habeas petition, Byrd had eighteen months to ask for leave to amend his petition. Byrd's attorney reported to a newspaper that he was holding back on the so-called "actual innocence" affidavit. Yet Byrd waited almost one year after our decision was filed, and, at the eleventh hour, filed this second habeas petition.[1] It may be that Byrd's attorney should be censured, but in the end, this attorney has "had his way" with this Court.

As I understand the facts, a few select active judges were called by telephone for their vote and other active judges were not. In fact, as of this date,.there is not any formal written confirmation or identification of who voted. There was no discussion as to the views and opinions of the minority of the Court members. This Court should be governed by the Rule of Law, and proper procedures are part of that concept. I write this dissent in the hope that something like this never happens again, in this Court or in any other court.

## DISSENT

BATCHELDER, Circuit Judge, dissenting from the order extending the stay of execution, in which SILER, Circuit Judge, joins.

The order granting the stay of execution until October 8, 2001, states "A majority of the active judges have voted to extend the stay of execution ..." It does not say that the request for this stay was referred to all of the active judges of the court. In fact, no such request was referred to me at any time. Rather, the request—which apparently came not from the petitioner but from Judge Jones—was referred only to those members of the court who could be counted upon to vote in favor of the stay.

As best I am able to determine, one judge of this court orally ordered this stay to be entered, stating that it represented the votes of a majority of the court. There was never any written request for a stay. There was no written vote. In short, there is no record of the cabal that resulted in this stay.

---

**1.** I should add that Byrd engaged in the same deceitful behavior in state court. As the state trial court judge noted on May 25, 2001, Byrd withheld the 1989 affidavit "even though Byrd had a motion for a new trial pending at that time." *State v. Byrd*, No. B–831662(A) (Hamilton C.P. May 25, 2001).

There is no room for argument about whether all of the judges in active service are members of the en banc court. They are. *See* 28 U.S.C. § 46(c). In this circuit, however, only some of those judges are permitted to have notice of requests made to the en banc court and to vote on those requests.

I write in dissent from this purported order because I was given no opportunity to vote on the request for the stay, and I will not be party to either the procedure that produced it or the precedent that some of the members of this court are attempting to set.